UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation | MDL No. 05-1708 (DWF/AJB) |
| This Document Relates to: UFCW Local 1776 and Participating Employers Health and Welfare Fund, on behalf of themselves and all others similarly situated, Plaintiff, v.   Civil No. 05-2859 (DWF/AJB) Guidant Corporation, *et al.*, Defendants. and City of Bethlehem, Pennsylvania, individually and on behalf of all others similarly situated, Plaintiff, v.   Civil No. 05-2883 (DWF/AJB) Guidant Corporation, *et al.*, Defendants. | **ORDER REGARDING COMMON BENEFIT ASSESSMENT AS TO TPP PLAINTIFFS** |

# INTRODUCTION

This matter is before the Court pursuant to the request of UFCW Local 1776 and

Participating Employers Health and Welfare Fund (the "UFCW Fund") and the City of

Bethlehem, Pennsylvania (the "City") (together, the "named TPP Plaintiffs") that the Court waive the applicability of Pretrial Order No. 6 ("PTO 6") Paragraphs A.1.a and A.1.f.  PTO 6, which was entered by this Court on February 15, 2006, requiring the 4% Common Benefit Assessment on all Guidant litigation.  Specifically, in 2011, the named TPP Plaintiffs, along with nearly 35 other payors (collectively, the "TPP Plaintiffs"), entered into a settlement of all claims stemming from the litigation.[1]  The Plaintiffs' Lead Counsel Committee (the "PLCC") opposes the named TPP Plaintiffs' request.

The factual background and procedural history of this case guide, if not dictate, the Court's decision on the named TPP Plaintiffs' request to waive the 4% Common Benefit Assessment.  While the parties have addressed some of the issues pertinent to the 4% Common Benefit Assessment, each has left out significant portions of the history of this case, which the Court will address below.

## BACKGROUND

### A.  Procedural History

The procedural history associated with the TPP Plaintiffs' cases, as the Court observed in its January 15, 2010 Order, is convoluted to say the least.  On December 9, 2005, the UFCW Fund filed a class action complaint against Guidant directly with this Court.  At that time, the UFCW Fund noted on its civil cover sheet that the case was related to the *Guidant* MDL.  In its complaint, the UFCW Fund alleged five claims

---

[1]  The terms of the settlement are confidential.  The Court has been informed of all of the details of the settlement, including the amount of the settlement, as well as the number of participating Third Party Payors.

against Guidant:  (1) Subrogation Liability Determination; (2) Violation of Consumer Protection Statutes; (3) Products Liability; (4) Common Law Fraud; and (5) Unjust Enrichment.

On December 13, 2005, the City filed with this Court a one-count class action complaint against Guidant for violations of unfair and deceptive trade practices under state law.  On January 23, 2006, Guidant (not the PLCC) sent a letter to this Court, stating that the City's case was "related" to the *Guidant* MDL and requesting that the Court "consolidate" the City's case with the *Guidant* MDL because "consolidating . . . will assist in the timely and efficient management of all of [the] cases and . . . there is no reason for this case to proceed independently."  (Civ. No. 05-2883 (DWF/AJB), Doc. No. 10.)  The case was then assigned to the undersigned and Chief Magistrate Judge Arthur J. Boylan on January 25, 2006 pursuant to an Order for Reassignment of Related Cases.

On April 24, 2006, the PLCC filed a Master Complaint in MDL 05-1708 (DWF/AJB).  (Doc. No. 132.[2])  The PLCC asserted that it filed the Master Complaint "to serve the administrative functions of efficiency and economy of presenting certain common claims and common questions of fact and law for appropriate action by this Court, including trial, in the context of this multidistrict proceeding."  (*Id.* ¶ 2.) Significantly, the Master Complaint included claims of "third party payors . . . all of whom bear the ultimate economic risk of health care payments . . . against Guidant, for

---

[2]   Unless otherwise noted, all docket references will be to MDL No. 05-1708 (DWF/AJB).

3

its sale and distribution of defective heart devices, and for its otherwise wrongful marketing, promotion, advertising and sale of these devices." (*Id.* ¶ 9.)

In the Master Complaint, pursuant to Federal Rule of Civil Procedure 23, the UFCW Fund and the City, both residents of Pennsylvania, were the named TPP Plaintiffs, and together they brought claims on behalf of themselves and all others similarly situated:

> [A]ll third party payors . . . in the United States (or its Territories) who (i) have been issuers or sponsors of a contract, policy or plan that provides medical coverage to natural persons, and (ii) have incurred, pursuant to such contract, policy, or plan, full or partial costs of any of the [pacemakers and ICDs] and related medical costs including implantation surgery, replacement surgery, medical monitoring and/or hospital costs.

(*Id.* ¶ 254.) The TPP Plaintiffs asserted that, for the purposes of the TPP class definition, "third party entities 'purchased' the Guidant Devices if they paid some or the entire purchase price." (*Id.*) In addition, they asserted that, as a direct and proximate cause of Guidant's conduct, "[p]ublic and private payors of health insurance have had to shoulder, wrongfully, an enormous economic impact of Guidant's conduct, [in] an amount that is in the hundreds of millions of dollars." (*Id.* ¶ 9.)[3]

In the spring of 2007, Guidant moved to dismiss the Medicare Secondary Payor Claims and the Third-Party Payor Claims in the Master Complaint. Notably, as the Court observed in its January 15, 2010 Order, the parties' arguments assumed that the TPP Plaintiffs were asserting claims relating to insureds who had made claims against Guidant

---

[3] See the Court's Order of January, 15, 2010 (Doc. No. 4413) for a more detailed account of the procedural history of the case as it relates to the TPP Plaintiffs.

in the MDL. On May 9, 2007, the Court agreed with Guidant and dismissed without prejudice[4] seven of the TPP Plaintiffs' claims against Guidant after concluding that the TPP Plaintiffs lacked standing to pursue those claims and noting such claims were not ripe. (Doc. No. 1743.) In a second Order dated May 9, 2007, the Court also denied the TPP Plaintiffs' request to amend the seven claims in the Master Complaint, concluding that any amendment would be futile because the claims were not ripe given that they were dependent on a finding that Guidant was first liable to the TPP Plaintiffs' insureds. (Doc. No. 1739.)

Shortly thereafter, the TPP Plaintiffs filed a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit, which the Eighth Circuit dismissed for lack of jurisdiction on August 17, 2007. (Doc. No. 2339.) The TPP Plaintiffs also filed a Motion for Entry of Judgment Under Fed. R. Civ. P. 54(b) or, in the Alternative, for Certification Under 28 U.S.C. § 1292(b). (Doc. No. 2200.) The Court denied that Motion on November 16, 2007, finding that the TPP Plaintiffs' claims were not separate or distinct from the other claims in the Master Complaint and that the claims at issue did not involve controlling questions of law and would not materially advance the ultimate termination of the litigation. (Doc. No. 2497.)

As the parties are aware, in December 2007, a global settlement concerning the individual plaintiffs was reached. On March 30, 2009, with the Court's permission, the

---

[4] The Court originally dismissed the remaining seven claims with prejudice in its April 16, 2007 Order. (Doc. No. 1591.) In response to a request by the TPP Plaintiffs, the Court, in an Order dated May 9, 2007, amended the April 16, 2007 Order to dismiss the seven claims without prejudice. (Doc. No. 1743.)

TPP Plaintiffs filed a Motion for Reconsideration of the Court's May 9, 2007 Orders and/or its November 16, 2007 Order. (Doc. No. 3821.) In that Motion, the TPP Plaintiffs raised for the first time the argument that their claims were in no way limited to instances in which the TPP Plaintiffs' insureds also had an underlying personal injury claim against Guidant in the MDL.[5]

**B.     Attorney Fees**

The PLCC asserts that Thomas M. Sobol and his firm applied for and received an MDL Common Benefit fee award for work done on behalf of his clients, the Third-Party Payors, including the settling plaintiffs, in the amount of $209,178. The PLCC goes on to state in its March 9 submission to the Court that counsel for the TPP Plaintiffs received $678,461 pursuant to the Court's December 23, 2008 Common Benefit Attorney Fee Allocation Order at the same time that Hagens Berman Sobol LLP received $209,178. The PLCC also asserts that, in total, TPP Plaintiffs' counsel received $887,639 in MDL Common Benefit Attorney Fees in addition to receiving $26,995.50 in MDL Common Costs and reimbursement of the firm's $50,000 in Plaintiffs' Steering Committee

---

[5]     See the Court's Orders of July 1, 2009 (Doc. No. 3992) and January 15, 2012 (Doc. No. 4413) where the Court observed:

> [T]he Court notes that the argument that the named TPP Plaintiffs' claims are in no way limited to instances where the TPP's insureds also have an underlying personal injury claim against Guidant in this MDL appears to be a new argument or, at the very least, an argument that is now being flushed out. Nonetheless, there appears to be no dispute that the named TPP Plaintiffs have insureds who have asserted claims against Guidant in this MDL and insureds who have not asserted claims against Guidant in this MDL.

(Doc. No. 3992 at 4-5).

("PSC") MDL Assessments. TPP Plaintiffs' counsel, on the other hand, asserts that those payments are irrelevant to the issue before the Court. However, not unlike the procedural history the Court has set forth, there is more to the attorney fee issue as well. Mr. Sobol's firm submitted an initial request of $262,284 for common benefit attorney fees.[6] The Common Benefit Attorney Fee and Cost Committee ("CBAFCC") recommended a 0.5 multiplier for an award of $130,737, to which the firm did not object. As noted by both parties, Mr. Sobol was a member of the PSC. The Court reviewed the submissions by Mr. Sobol's firm and, as the December 23, 2008 Order sets forth, the submissions included client-specific work, especially in the time prior to the MDL's inception, and work related to plaintiff fact sheets and complaints that the Court did not deem to be common benefit work. Based upon its *de novo* review, the Court awarded $209,178 to Hagen Berman Sobol, LLP on December 23, 2008. (Doc. No. 3558.)

With respect to Schiffrin Barroway Topaz & Kessler, LLP, the firm submitted a request for $1,204.324. The CBAFCC recommended an award of $193,846, to which the firm did object. Rather, the firm's objections at the time noted that one of its lawyers was on the PSC where he discussed strategy issues and attended meetings of the PSC as well as assisted in drafting the Master Complaint. It was the CBAFCC's position that some of the firm's time was spent staying apprised of the status of the case and included work that could not be attributed to the common benefit. Based upon its *de novo* review, the Court awarded $678,461 to Schiffrin Barroway Topaz & Kessler, LLP. (*Id.*)

---

[6] The Court entered an order on Common Benefit Attorney Fee Allocation on December 23, 2008. (Doc. No. 3558.)

The Court's summary of the procedural history of this case as well as its discussion of the attorney fees issue provide the context within which the 4% Common Benefit Assessment issue has come before the Court.

## DISCUSSION

It is true that the TPP Plaintiffs' cases were specifically separated from the MDL pursuant to this Court's January 15, 2010 Order. (Doc. No. 4413.) However, contrary to the position of the TPP Plaintiffs, it was Guidant who proceeded with the motion to do so, rather than the PLCC hampering the efforts of the TPP Plaintiffs' claims. The judicial irony of the situation is that the individual cases of the UFCW Fund and the City were made part of the MDL through the District's Revised Order for Assignment of Cases dated December 19, 2008. Like most districts, the assignment plan is administrative, not a legal or jurisdictional doctrine.[7] The Court had the discretion to separate the UFCW Fund's and City's cases from the MDL, which it did.

Counsel for the TPP Plaintiffs cites a decision by the Honorable Eldon E. Fallon in the *Vioxx* MDL. *In re Vioxx Prod. Liab. Litig.*, 2012 WL 10548 (E.D. La. Jan. 3, 2012). As Judge Fallon correctly concluded, "[the government] settlement fund does not appear to be a product of any benefit conveyed on the settling states by the PSC's efforts." *Id.* at *3. However, the case before the Court is distinguishable from the *Vioxx* case. In *Vioxx*, there was an "insurmountable disconnect," as Judge Fallon pointed out, because the settlement fund was created through a criminal investigation (at its inception before

---

[7] See the Court's discussion of the related case doctrine in its January 15, 2010 Order. (Doc. No. 4413 at 8-9.)

the *Vioxx* MDL had begun) and through the separate and independent efforts of the United States Attorney's Office for the District of Massachusetts, Department of Justice, and the National Association of Medicaid Fraud Unit's negotiating team. Such is not the case here. The foundation for the liability that was the basis for the settlements in all cases before the Court was, in substantial part, created by the work done by the MDL Common Benefit Attorneys, precisely as intended in most MDLs. As the PLCC correctly points out, the MDL Common Benefit work was the core litigation effort that evaluated Guidant's conduct during the time periods in question. The notion that the work that was done with respect to discovery and the motions related to the preparation for the *Bellwether* trials was entirely irrelevant to the willingness of Guidant to settle the cases, including the settlement of the TPP Plaintiffs' claims, is contrary to the record before the Court. That is especially the case given the fact that it was not until March of 2009 that the TPP Plaintiffs argued for the first time that their claims were in no way limited to instances where the TPP Plaintiffs' insureds also had an underlying personal injury claim against Guidant in the MDL.[8]

So why has the Court expended this amount of time addressing the 4% Common Benefit Fee Assessment issue? The Court is of the view that the procedural history and the posture of the parties in the context of that procedural history provide the answer for what a fair and appropriate decision by the Court is to be. Unlike *Vioxx*, this is not a

---

[8]   From early 2006 through July 2007, the parties conducted extensive discovery, motion practice, and prepared for five *Bellwether* trials. Shortly before the first *Bellwether* trial was to begin in July 2007, Guidant and the individual Plaintiffs entered into a global settlement, and ultimately entered into a confidential Master Settlement Agreement on December 10, 2007.

situation where there is no nexus or where there is "insurmountable disconnect," to use the words of Judge Fallon.  However, contrary to the views of the PLCC, the TPP Plaintiffs are not in precisely the same situation and have not received the same benefits that the individual claimants have received in the case.

Evaluating the benefits received by the TPP Plaintiffs based upon the record before the Court (which of course includes the Court's evaluation of how the Common Benefit work and the discovery related to that work impacted Guidant), and despite the fact that Guidant has taken no position with respect to the issue before the Court, the Court concludes that a 2% Common Benefit Assessment is proper.  The Court finds that a 2% Common Benefit Assessment is consistent with the contribution to and impact of the Common Benefit work and (to use the approach taken by Judge Fallon in *Vioxx*) the nexus between the Common Benefit work and the settlement of the TPP Plaintiffs' claims.  The procedural history of this case, the conduct of all of the parties, and the record before the Court reinforce the Court's decision.  For these reasons, the Court grants in part and denies in part the motions and requests of the parties.

Based upon the presentations of the parties, and the Court having reviewed the extensive procedural history and record of this case, and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

**ORDER**

TPP Plaintiffs shall pay a 2% Common Benefit Assessment of the settlement reached between the TPP Plaintiffs and Guidant.

Date:  May 23, 2012             s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge